UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 1:19-cr-00733 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| | ) | |
| JERY BARTON, *et al.* | ) | |
| | ) | |

MEMORANDUM OPINION AND ORDER

This opinion decides the pretrial motions filed by the Defendants. The ones that occupy most of the discussion are four pretrial motions brought by Defendant Jery Barton: a motion to dismiss the indictment, R. 100; a motion to sever the charges from those brought against his co-defendants, R. 102; a motion to change venue, R. 103; and a motion to suppress the wiretap evidence, R. 108.[1] For the reasons that follow, all of those motions are denied. The various other motions (mostly setting various deadlines) are denied in part and granted in part.

## I. Motion to Dismiss

Barton and his two co-defendants, Erick Bustamante and Ricky Owen, have been charged with money-laundering conspiracy and substantive counts of concealment money laundering. R. 60, Indictment. In sum, the indictment alleges that Bustamante, Owen, and Barton (as well as unnamed others) participated in a conspiracy to launder millions of dollars in drug proceeds. Indictment at 2–7. The

---

[1]Barton's severance motion is brought on behalf of himself only. R. 128, Defs.' Cons. Replies at 13 n.3.

indictment details Bustamante's and Owen's alleged arrangements with drug-pro-
ceeds couriers located throughout the United States; Bustamante and Owen are al-
leged to have communicated with this network of couriers, made and carried out
plans to pick up drug money in the Chicago area as well as in several other states,
deposited the cash into a variety of bank accounts, and then wire-transferred the
funds out of these accounts. *Id.* In some contrast to Bustamante's and Owen's more
operation-heavy roles, Barton is alleged to have controlled some of the bank accounts
through which Bustamante, Owen, and others transferred funds. *Id.* at 4–7. In all,
Barton is alleged to have controlled accounts through which around $836,019 in drug
proceeds was deposited. *Id.* at 4 ¶ 10. Not surprisingly, however, the indictment does
allege that Barton agreed to join the overall laundering conspiracy:

> It was further part of the conspiracy that ERICK BUSTAMANTE, RICKY
> OWEN, JERY BARTON, and Co-Conspirator A agreed with individuals who
> owned and controlled drug proceeds located in the United States ("drug pro-
> ceeds owners") to have the MLO [money laundering organization] collect, de-
> posit, and transfer drug proceeds from drug proceeds couriers located through-
> out the United States, including in the Chicago area, on behalf of the drug
> proceeds owners.

Indictment ¶ 3.

Barton is charged in two of the five counts in the indictment: the conspiracy
"to knowingly conduct and attempt to conduct a financial transaction involving pro-
ceeds of a specified unlawful activity," in violation of 18 U.S.C. § 1956(a)(1)(B)(i)
(Count One); and a particular instance of concealment money laundering via

Huntington Bank in Oak Lawn, Illinois on May 2, 2019, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 (Count Five). Indictment at 1, 11.

Barton now seeks to dismiss the indictment on two grounds: insufficient notice of the charges and improper venue. R. 100 at 1. On insufficiency, Barton's argument centers around the contention that the government has not alleged conduct, much less "factual particulars," showing that he knew that the money represented proceeds from unlawful activity, which of course is an element of the laundering offenses with which Barton is charged. *Id.* at 5–6. Instead, Barton argues, the indictment only alleges that he knew of and perhaps conducted particular transactions, without knowledge of the source of funds or that the purpose of the transactions was to conceal unlawful activity. *Id.*

The lack-of-notice argument fails, because the Federal Rules of Criminal Procedure do not demand the type of evidentiary detail that Barton demands. Criminal Rule 7(c)(1) provides, in relevant part, that the "indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7(c)(1). "An indictment is legally sufficient if it (1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958–59 (7th Cir. 2010). The indictment fulfills all of these requirements.

3

First, contrary to Barton's argument, the indictment does "state[] all the elements of the crime charged," as to both facts and law. *Id.* The money-laundering statute provides:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—(B) knowing that the transaction is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

18 U.S.C. § 1956(a)(1)(B)(i). The Seventh Circuit instructs that an indictment "that 'tracks' the words of a statute to state the elements of the crime is generally acceptable, and while there must be enough factual particulars so the defendant is aware of the specific conduct at issue, the presence or absence of any particular fact is not dispositive." *White*, 610 F.3d at 958–59. Here, the text of Count One of the indictment almost precisely tracks the text of the statute, alleging that Bustamante, Owen, and Barton conspired:

> to knowingly conduct and attempt to conduct a financial transaction involving proceeds of a specified unlawful activity, namely, the felonious buying and selling and otherwise dealing in a controlled substance, *knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity*, and that the transaction was designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity …."

Indictment at 1 (emphasis added). So the text of the indictment (in particular the italicized clause) alleges the required statutory element that Barton knew that the funds were proceeds of an unlawful activity. What's more, the indictment actually

4

contains five pages of factual detail outlining the alleged conspiracy, including allegations that Barton knew of the overall design of the conspiracy and the agreements with drug-proceeds couriers. Indictment at 2–7. The factual background specifies particular time frames, bank accounts, and amounts of money alleged to have been deposited into or transferred out of the relevant accounts. *Id.* "While it is true that an indictment must do more than recite the statutory elements, this does not mean that the government is required to provide every factual nugget necessary for conviction. Rather, the indictment need only provide some means of pinning down the specific conduct at issue." *United States v. Fassnacht*, 332 F.3d 440, 445 (7th Cir. 2003). Barton is sufficiently on notice as to the substance of the charges against him, and can prepare a defense (even focusing in on particular months, accounts, and transactions).[2]

Having said that, the ordinary workings of the pretrial process will shed additional light as the trial date approaches (if Barton chooses to go to trial). Under the Court's standing order governing criminal pretrial litigation, the government (and the Defendants) will be required to file exhibit lists, witness lists, and so on. Plus, the government will be required to make a *Santiago* proffer. So Barton will have plenty

---

[2]Barton's motion appears to challenge both Count One and Count Five. *See* R. 100 at ¶ 1. But the substance of his argument focuses only on Count One. To the extent that Barton also sought to challenge Count Five, that charge is even more specific, charging a particular transaction made in a particular account in a particular bank branch on a specific date. Indictment at 11. Especially in combination with the factual background provided in Count One, Count Five easily clears the bar for sufficient notice.

more detail as to how the government hopes to prove its case, and will have ample time to prepare a defense.

Next, Barton seeks to dismiss the indictment for improper venue. He observes that he lived in the Northern District of Ohio at all relevant times, and that all the accounts he is alleged to have controlled are "located" in that district. R. 100 at 7–8. Barton thus argues that the Northern District of Ohio is the proper venue for the charges against him. This argument misconstrues the substance of the indictment as well as the applicable law.

The venue provision of the statute under which Barton was charged provides that venue is proper in any district in which "the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1). For conspiracy charges, "venue is proper against the defendant in any district where a co-conspirator carried out overt acts even though there was no evidence that the defendant had entered that district or that the conspiracy was formed there." *United States v. Ochoa*, 229 F.3d 631, 636–37 (7th Cir. 2000) (cleaned up)[3]. So there is no need for Barton to have been physically present in Illinois to be charged here. Instead, it is enough, for venue's sake, that he allegedly conspired to conceal drug money in the Illinois bank accounts into which hundreds of thousands of dollars were deposited. Indictment at 4–5 (identifying deposits into Huntington Bank accounts in Oak Lawn, Illinois). Plus, Barton's co-conspirators

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

allegedly committed a variety of overt acts in this District, including numerous drug-money pick-ups in the District in furtherance of the conspiracy. *Id.* at 2–3.

Against this, Barton relies on *United States v. Cabrales*, 524 U.S. 1, 8 (1998), *see* R. 100 at 9, but there the Supreme Court distinguished substantive counts from conspiracy. *Cabrales* held that money-laundering venue was improper in Missouri where Missouri was merely the location of the underlying *drug* deals that generated the proceeds to be laundered—but the money-laundering *transactions* took place from beginning to end in Florida. 524 U.S. at 8. "Notably," the Supreme Court observed, "the counts at issue do not charge Cabrales with conspiracy." *Id.* at 7. So *Cabrales* does not undermine the applicability of venue in Illinois as to the conspiracy count.

Nor is there any problem with the venue as to the substantive concealment charge in Count Five (which Barton does not address explicitly in his briefs). The substantive count targets a particular financial transaction that is alleged to have taken place at a Huntington Bank in Oak Lawn, Illinois. Indictment at 11. With the actual transaction allegedly taking place in Illinois, there is no way to refute venue here for that count—at least at the pretrial stage. If Barton pursues an objection to venue, then he can seek a jury instruction on this during the pretrial-conference stage and ask that the government be required to prove venue (by a preponderance) at trial. *United States v. Tingle*, 183 F.3d 719, 726–27 (7th Cir. 1999); *United States v. Kampiles*, 609 F.2d 1233, 1239 (7th Cir. 1979). At that point, venue would become an issue for the jury, which would decide whether the government's proof of location of the money-laundering conspiracy and the substantive transaction is sufficient.

7

## II. Motion to Sever

Barton has moved to sever his trial from that of his co-defendants, R. 102, observing that he is not alleged to have personally been involved in picking up drug proceeds and arguing that all of the evidence that will likely be presented as to illegal drug deals will prejudice him in the eyes of the jury. R. 102, Mot. to Sever, at 2–4. Barton further argues that a joint trial will violate his constitutional rights under the Confrontation Clause pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), because he will be exposed to the statements of co-defendants. *Id.* at 4. Finally, Barton argues that there is a misjoinder of defendants under Federal Rule of Criminal Procedure 8(b). *Id.* None of these arguments warrant a severance at this stage of the case.

### A. Joinder in the Indictment

First, on joinder, Criminal Rule 8(b) authorizes charging more than one defendant in an indictment so long as the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Barton argues that he is not alleged to have engaged in exactly the same acts as his co-defendants: for example, he "did not engage in the recruitment of undercover DEA agents to transport [] illegal narcotics or illegal narcotics proceeds," he "did not participate in the collection of [those] proceeds," he did not travel or make travel arrangements for others to pick up the proceeds, and he "did not recruit third party businesses and law firms with bank accounts into which they [the alleged co-conspirators] could deposit the proceeds."

8

Mot. to Sever at 5. But a precise overlap in alleged misconduct is not the requirement in Criminal Rule 8(b). Instead, Rule 8(b) is broader, allowing joinder of defendants if they "participated" in the same "*series* of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b) (emphasis added). In a conspiracy, it is par for the course that coconspirators participate in a series of acts or transactions that make up the overall conspiracy. Indeed, as the government observes in its response, "that each co-defendant occupied different primary roles and took different acts to further their conspiracy is an unremarkable and inherent characteristic of every conspiracy, not a basis for severance." R. 126, Gov't Cons. Resp. at 40.

Here, the indictment alleges that Barton, Bustamante, and Owen participated in a conspiracy to launder drug proceeds. Count One of the indictment, under which Barton is charged along with Bustamante and Owen, details the alleged laundering conspiracy, including allegations that Barton was aware of and participated in the overall laundering plan even though he did not participate personally in each step of the process. Indictment, ¶¶ 2–3, 8, 10, 12–13. Barton allegedly played his role—controlling certain bank accounts—and his co-conspirators allegedly played theirs. With regard to the substantive count, this charge too allegedly was part of the same series of transactions that made up the overall conspiracy. There is no joinder problem with the indictment.

## B. Joinder for Trial

Next, there is no basis to sever Barton from his co-defendants for trial. Federal Rule of Criminal Procedure 14(a) authorizes severance of defendants (and offenses)

9

for trial purposes if genuine prejudice would result: "If the joinder of offenses or de-

fendants … for trial appears to prejudice a defendant or the government, the court

may order separate trials of counts, sever the defendants' trials, or provide any other

relief that justice requires." Fed. R. Crim. P. 14(a). But there is a strong public inter-

est in joint trials of jointly charged defendants (if properly joined in the indictment),

because joint trials both promote judicial efficiency (not to mention avoiding the bur-

den of another set of jurors) and avoid the risk of inconsistent verdicts arising from

two sets of jurors. *See Richardson v. Marsh*, 481 U.S. 200, 210 (1987); *United States

v. Blassingame*, 197 F.3d 271, 286–87 (7th Cir. 1999); *United States v. Magana*, 118

F.3d 1173, 1186 (7th Cir. 1997); *United States v. Buljubasic*, 808 F.2d 1260, 1263 (7th

Cir. 1987); *United States v. Phillips*, 239 F.3d 829, 838 (7th Cir. 2001). So the joint-

trial rule is construed "broadly … in order to enhance judicial efficiency," *United

States v. Stillo*, 57 F.3d 553, 556 (7th Cir. 1995), and defendants seeking severance

have the burden of showing that they would be denied a fair trial without it. *United

States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000). A defendant may do so by

demonstrating that "there is a serious risk that a joint trial would compromise a spe-

cific trial right … or prevent the jury from making a reliable judgment about guilt or

innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

Given the presumption that co-conspirators *should* be indicted and tried to-

gether, *see Phillips*, 239 F.3d at 838, Barton faces an uphill battle. Barton argues that

he will be prejudiced at trial given the evidence of drug deals likely to be marshaled

against Bustamante and not against Barton. Mot. to Sever at 7. But the "prevailing

10

preference is that codefendants be tried together. That preference is especially strong for coconspirators who are indicted together." *United States v. Jett*, 908 F.3d 252, 276 (7th Cir. 2018) (cleaned up). The risk of spillover prejudice must be high, with significant disparities between the conduct alleged as to each co-defendant, in order for this alone to warrant severance. *See, e.g.*, *United States v. Morales*, 655 F.3d 608, 626 (7th Cir. 2011) (affirming the rejection of severance even where co-defendants were charged with murder and drug conspiracies, and the defendant was not so charged); *United States v. Papia*, 560 F.2d 827, 836–37 (7th Cir. 1977) (affirming the rejection of severance even where one co-defendant was alleged to have planned an assault, battery, and arson, whereas the other defendant was charged only with verbal threats). The situation that Barton describes is run-of-the-mill for many conspiracy charges: it is unlikely that individuals charged as co-conspirators would have committed exactly the same acts, yet co-conspirators are tried together all the time. Indeed, to prove-up a conspiracy, the government would need to introduce evidence on the conspiracy anyway; it is not as if the government could skip out on introducing evidence of the underlying drug deals merely because Barton was alone at trial. The alleged laundering requires proof of the underlying unlawful activity that generated the proceeds. Most of the evidence would be coming in anyway.

Also, the jury will be instructed properly on the elements of the particular offenses with which Barton is charged, as well as the requirement that the jury must be give separate consideration to each defendant. *See, e.g.*, *Papia*, 560 F.2d at 837 ("Ultimately the question is whether, under the circumstances of the particular case,

a properly instructed jury can follow the court's limiting instructions and assess each defendant's guilt or innocence solely on the basis of the evidence admissible against him."). There is no reason to sever Barton for trial purposes.

## C. *Bruton*

Barton's final argument for severance invokes his Confrontation Clause rights under *Bruton v. United States*, 391 U.S. 123 (1968). The argument is not particularly well developed, but apparently Barton is concerned with the intercepted telephone calls between Bustamante, Owen, and other co-conspirators, in which the co-conspirators discuss Barton and things that Barton did. Mot. to Sever at 6. But this argument misunderstands *Bruton*, which only bars *testimonial* hearsay statements (like law-enforcement interview statements and post-arrest confessions) of non-testifying co-defendants against another co-defendant. *See United States v. Spagnola*, 632 F.3d 981, 988 (7th Cir. 2011). Barton proffers no reason to believe that these intercepted calls are somehow confessions made to law enforcement. Instead, if anything, the description of the calls leads the Court to think that they will be admissible co-conspirator statements, Fed. R. Evid. 801(d)(2)(E) (authorizing admission of statements "made by the party's coconspirator during and in furtherance of the conspiracy"), of course subject to an evaluation of the government's *Santiago* proffer. The wiretapped calls are no basis to try Barton separately.

## III. Motion to Change Venue

Barton's next request is to change venue from the Northern District of Illinois to the Northern District of Ohio, on grounds of convenience and the interests of justice

pursuant to Federal Rule of Criminal Procedure 21(b). R. 103, Mot. to Change Venue. Barton and the government agree that *Platt v. Minnesota Mining & Manufacturing Company* sets forth the pertinent considerations for considering a transfer of venue. 376 U.S. 240, 243–44 (1964). *Platt* approves a ten-factor test:

> (1) location of … defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer." *Id.* Barton presents an analysis of each factor on an assumption that his trial would be severed from his co-defendants; the government, by contrast, argues under the assumption that the trial would remain joint.

Mot. to Change Venue at 4–6; R. 126, Gov't Cons. Resp. at 42. Because the Court has decided that Barton will not be severed for trial, as discussed above, the analysis will proceed on that basis.

**1. Location of Defendants.** There are three defendants, each in a different state (Barton in Ohio, Owen in California, and Bustamante in Illinois). Gov't Cons. Resp. at 42. Trial in any given location will necessarily require that at least two of the defendants travel, so this factor does not favor transfer.

**2. Location of Witnesses.** Second, the location of witnesses, if anything, weighs more heavily in favor of Chicago as the site of trial. Barton asserts that "character witnesses who might be called are located in Holland, Ohio," but does not show that they would be unavailable to travel to Chicago. Mot. to Change Venue at 5. And, given the limits on character evidence, Fed. R. Evid. 404(a), (b); Fed. R. Evid. 608(a),

(b), it is not likely that these witnesses' testimony would make up the bulk of the trial. In contrast, the government lists six potential witnesses, three of whom are the case agents, in Chicago. Gov't Cons. Resp. at 43. If anything, this factor tips in favor of Chicago.

**3. Location of Events.** Barton argues here, as he did in his motion to sever, that his own alleged criminal conduct occurred in Ohio. Mot. to Change Venue at 3, 5. But the scope of the alleged conspiracy was broader, encompassing at least seven states. Indictment at 2–7; Gov't Cons. Resp. at 43. Much of the conduct is alleged to have occurred in Chicago. Indictment at 2–7. As explained elsewhere in this opinion, the trial must include evidence of the entire alleged money-laundering conspiracy. This factor cuts against transfer.

**4. Location of Records.** Barton argues that because the banks at which the accounts in question were held are located in Ohio, the pertinent records likely are in Ohio. Mot. to Change Venue at 5. But the government proffers, and Barton does not challenge, that it has provided most of its discovery electronically. Gov't Cons. Resp. at 44. That is not surprising, because in this day and age, parties in both civil and criminal cases regularly access discovery materials in digital format or, at worst, photocopy records and readily send them across the country. This factor does not favor any particular location for trial.

**5. Disruption of Business.** Barton's business will not be disrupted by a trial in Chicago. He is retired from the practice of law and does not appear to have any other employment right now. Mot. to Change Venue at 5. Barton does allude to the

idea that his character witnesses may be interrupted in their businesses, *id.*, but Barton makes no specific showing on this point, especially relative to any inconvenience to any witnesses put on by any other co-defendants or the government. Plus, as noted earlier, it would be surprising if character testimony took much trial time, so mindful scheduling should allow the witnesses to travel in and out of Chicago speedily. This factor does not favor transfer.

**6. Expense to Parties.** Barton argues that the expense of traveling to and staying in Chicago for the duration of the trial will be prohibitive. Mot. to Change Venue at 5–6. The government argues that he has not made a specific factual showing on this point, and observes that his counsel is located in Chicago. Gov't Cons. Resp. at 44. Those points are right, and on top of that, if Barton is indigent (as it appears he is, at least for purposes of qualifying for court-appointed counsel), then he may move for travel and lodging funds under 18 U.S.C. § 4285.

**7. Location of Counsel.** The location of counsel favors Chicago as the location for trial. Barton's counsel and all of the government's attorneys are located here.

**8. Accessibility of Trial Venue.** The accessibility of the place of trial does not necessarily favor one location or the other. Because the trial will be joint, it is likely that at least two defendants, and by extension perhaps some counsel and witnesses, will need to travel to whatever the location of trial is. So, as the government argues, this factor favors only a location that is easily accessible by multiple means of transportation. Gov't Cons. Resp. at 46. Chicago has two major airports and numerous highways, train, and bus lines radiating across the country. It is at least as

accessible as anywhere else, and likely more so than the Northern District of Ohio. This favor does not support transfer.

**9. Docket Congestion.** The relative docket condition of each district is unclear and is not dispositive. Barton argues only that "it is expected that the Northern District of Illinois has a larger criminal docket than the Northern District of Ohio and, thus, the Northern District of Ohio has potentially fewer cases with speedy trial considerations." Mot. to Change Venue at 6. Given the plethora of considerations under the Speedy Trial Act's broad interests of justice considerations, that assertion is not supported by anything concrete; the number of pending cases by themselves (especially if not broken down on a per-judge basis) is not a particularly persuasive comparison. Trial scheduling, especially while the nation's courts are still under pandemic conditions, is not dependent solely on the number of trials but also on the availability of facilities, caseload per judge, and so forth. Barton has not shown that his trial would be unduly delayed in the Northern District of Illinois, and therefore this factor does not favor transfer.

**10. Other considerations.** Barton refers only to the arguments he previously made in favor of severance. Mot. to Change Venue at 6. The Court has already decided that Barton's trial should not be severed, so this factor does not favor transfer.

All in all, the only concern with holding the trial in Chicago—Barton's financial difficulty in traveling to and from Chicago for trial—can be taken care of under federal law. 18 U.S.C. § 4285. Given the many considerations favoring trial in Chicago, the motion to change venue is denied.

16

### IV. Motion to Suppress

Finally, Barton moves to suppress evidence derived from the government's wiretap on two target phones, alleged to be used by co-defendants Bustamante and Owen. R. 108, Mot. to Suppress, at 3–4. The evidence includes conversations that users of the phones had directly with Barton, as well as conversations in which Barton was not a participant but which were about him. *Id.* Barton argues that the government did not have probable cause to intercept his communications. *Id.* at 5. The problem for Barton is that the law requires probable cause only as to the users of the target phones—not each and every interceptee.

Government interceptions of communications are subject to the requirements of the Fourth Amendment, and a judge issuing a warrant for a Title III wire interception must find "probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated under section 2516 of this chapter." 18 U.S.C. § 2518(3)(a). "Any aggrieved person … may move to suppress" evidence generated by wiretaps on any of three enumerated grounds: "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a).

In this case, the government applied for authorization to intercept communications from Target Phone 7 and Target Phone 8, which allegedly were used by Bustamante and Owen, respectively. *See* R. 127, Gov't Sealed Exhibits, Exh. 1, Aff. in

17

Support of Target Phone 7 T3 Application; Exh. 4, Aff. in Support of T3 Application for Target Phones 7 and 8. On the basis of these applications and their supporting affidavits, the Chief Judge of the Northern District of Illinois granted warrants to intercept both phones. Barton's argument is that those warrants were improperly granted, and that the Court made an erroneous probable-cause determination. But review of that probable-cause finding is highly deferential. *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014). "[A] warrant-authorized search must be sustained unless it is pellucid that the judge who issued the warrant exceeded constitutional bounds." *United States v. Aleshire*, 787 F.3d 1178, 1178 (7th Cir. 2015) (cleaned up). Here, as explained next, the issuing judge's probable-cause finding was well within constitutional bounds. Indeed, there was ample probable cause to sustain the issuance of the warrants.

Barton's brief fundamentally misunderstands the nature of the probable-cause requirement as it applies to him. He argues that the affidavits submitted in support of the wiretap applications do not give rise to probable cause that he was involved in criminal activity. Barton offers two main reasons: first, that information as to his involvement was primarily provided by a confidential source whose reliability cannot be proven and may not have had personal knowledge; and second, that because at least one intercepted conversation between Bustamante and Owen implied that they sought to conceal that the proceeds deposited into Barton's accounts were generated from unlawful activity, the only reasonable inference is that Barton himself was

18

unaware of their source and thus there is no probable cause to believe that he acted with the requisite knowledge or intent. Mot. to Suppress at 6–7.

"The government need not establish probable cause with respect to each and every person named in a wiretap order," only with respect to the *user* of each phone. *United States v. Marcy*, 777 F. Supp. 1400, 1402 (N.D. Ill. 1991). The statutory text of Title III makes this point. When it comes to probable cause, Title III requires "probable cause for belief that an individual is committing" one of the covered offenses (like money laundering), § 2518(3)(a); probable cause that the interception will capture "communications concerning that offense," § 2518(3)(b); and probable cause that "the facilities" (that is, the phone) are being used in connection with committing the crime, § 2518(3)(d). Nothing in that listing—"an individual," "communications," and "the facilities"—requires that probable cause be established as to every interceptee. So the government was only obligated to establish probable cause with regard to Bustamante and Owen, and *not* with respect to Barton. This the government did in the Title III affidavits. The affidavits are highly detailed in marching through the numerous investigative steps the government had taken to establish Bustamante's and Owen's alleged money laundering, readily surpassing the requisite probable cause. Gov't. Exh. 1, Target Phone 7 Aff.; Gov't. Exh. 4, Target Phones 7 and 8 Aff. For example, the affidavits describe details provided by confidential sources explaining exactly how the deposit process worked, *see* Target Phone 7 Aff., ¶ 14, and a meeting between Bustamante and an undercover agent in which Bustamante is alleged to have attempted to recruit the agent to transport drugs and drug proceeds by airplane.

19

*Id.*, ¶¶ 15–25. The affidavit averred that Bustamante used Target Phone 7 to arrange the meeting and made a call on that same phone during the meeting. *Id.* ¶¶ 21–22. With regard to Target Phone 8, allegedly used by Owen, the government's affidavit identified 337 phone calls between Target Phones 7 and 8 in a less than three-month period in early 2019, Target Phones 7 and 8 Aff. ¶ 42, as well as particular conversations between Bustamante and Owen on the target phones in which they discussed specific alleged money laundering transactions as well as plans for the overall conspiracy. *Id.* ¶¶ 26, 28. The affidavits more than support a finding of probable cause to intercept these phones.

Barton also argues that the affidavits do not satisfy the necessity requirement of 18 U.S.C. § 2518(1)(c), which requires each affidavit to contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *See also* United *States v. Thompson*, 944 F.2d 1331, 1339–40 (7th Cir. 1991). This requirement is not akin to exhaustion of all efforts before turning to a wiretap; the goal is simply to prevent wiretaps from being routinely deployed at the outset of an investigation. *United States v. McLee*, 436 F.3d 751, 762–63 (7th Cir. 2006); *United States v. Campos*, 541 F.3d 735, 746 (7th Cir. 2008) (cleaned up). As with the probable-cause finding, the Court reviews the necessity finding on a deferential standard of review. *McLee*, 436 F.3d at 763.

Here, the Title III affidavits discussed the myriad investigative techniques deployed by the government before it turned to a wiretap, including the use of

undercover agents and cooperating witnesses, physical surveillance, consensually recorded phone and in-person conversations, and documentary records. *See* Target Phone 7 Aff. ¶ 6. Also, the affidavits explained why other techniques would be ineffective or would compromise the investigation—for example, that certain physical surveillance techniques could alert Bustamante and his associates that they were being investigated, *id.* ¶ 37. Especially under the deferential standard of review, and given the nature of the burden in the first instance, this is more than sufficient to meet the necessity requirement. Barton argues only that the necessity requirement is designed to prevent the use of wiretapping "in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Castillo-Garcia*, 117 F.3d 1179, 1185 (10th Cir. 1997) (cleaned up) (overruled on other grounds by *United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002)), cited in Mot. to Suppress at 6. This is true so far as it goes, but it is not a developed argument as to why the government's affidavit, and the Chief Judge's finding, that the traditional investigative techniques that had or could have been used were insufficient under the circumstances was wrong.

Lastly, Barton makes an argument gesturing at possible attorney-client privilege issues. Mot. to Suppress at 7. It is true that Barton was an attorney, though his license was terminated as of April 4, 2019, shortly after the interception of Target Phone 7 began on March 29, 2019. Gov't Cons. Resp. at 19. The government realized that Barton was an attorney after it intercepted certain communications on Target Phone 7 and filed a Special Report to the Court on April 8, 2019, advising the Chief

Judge of this fact and promising to minimize certain communications involving Barton, though still emphasizing that it believed Barton was engaging in illegal activity. R. 127, Exh. 6, Target Phone 7 Special Report. The later affidavit filed in support of the government's application to continue to intercept Target Phone 7 and to intercept Target Phone 8 explained that the government had used a filter team to review all communications involving Barton for possible attorney-client privilege issues, but that the team had identified no potentially privileged communications. Target Phones 7 and 8 Aff., ¶ 100 n. 11. The government further explained that, given that Barton's law license was no longer valid and that there was no hint of an attorney-client relationship among anyone being intercepted, the government planned to discontinue use of the filter team going forward. *Id.*

Indeed, Barton has not even argued that he had an attorney-client relationship with Bustamante, Owen, or anyone else with whom he communicated. "The party seeking to invoke the [attorney-client] privilege bears the burden of proving all of its essential elements." *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). The attorney-client privilege is just that—between an attorney *and* a client. It does not protect all communications made by a current, much less former, attorney under all circumstances. For similar reasons, Barton's conclusory contention that the government has not proven that it in fact employed a filter team in accordance with the representations it made to the Chief Judge is not a basis to suppress the intercepted communications. Mot. to Suppress at 7. As the government argues, "Barton has had the intercepted communications and corresponding line sheets for more than a

22

year … he does not identify a single one that he claims is protected by privilege." Gov't Cons. Resp. at 21. That specification is the bare-minimum threshold to even begin to argue, under the circumstances, that "the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a)(iii).

For all those reasons, the motion to suppress the wiretap is denied. The interceptions of Target Phones 7 and 8 were supported by probable cause and necessity, and the court did not err in issuing those warrants. Further, there is no evidence that the government did not intercept the phones in accordance with the warrant, or that it intercepted or has relied in any way on privileged attorney-client communications.

## V. Other Motions

The Defendants also filed other motions that warrant a concise discussion.

**Bill of Particulars (R. 101, 116).** Barton and Owen ask for a bill of particulars. For Barton's part, he wants a bill in order to learn the specific financial transactions that he allegedly engaged in, as well as to learn the evidence showing that he knew the proceeds arose from specified unlawful activity. Owen similarly wants to know the specific drug proceeds that he allegedly collected, the deposits and transfers allegedly made by him, and the identity of the others whom he allegedly recruited to participate in the laundering. As discussed earlier in this opinion, however, the indictment actually reflects extensive details about the conspiracy and the overt acts in furtherance of the conspiracy, including time periods, means and methods of communicating with couriers, and identification of bank accounts and amounts deposited. Indictment at 2–6. This detail, combined with the discovery already disclosed and the

pretrial disclosures to follow (as noted earlier, exhibit lists, witness lists, and a *Santiago* proffer), is more than enough to put the Defendants on notice of the charges and to prepare a defense. *United States v. Glecier*, 923 F.2d 496, 502 (7th Cir. 1991) (in RICO judicial-bribery conspiracy, the indictment alleged the primary actors and methods/means of the conspiracy, and the discovery revealed specific co-conspirators; in addition, the *Santiago* proffer detailed the specific bribes and specific cases). No bill is needed.

**Rule 404(b) and 608(b) (R. 105).** On the defense requests for 45-day notice of Rule 404(b) evidence, the government has agreed to that timeline, so it is adopted. The Court notes that the deadline might actually call for a modestly earlier disclosure, because Rule 404(b) motions will be due along with motions in limine, which often are due more than 45 days in advance of the trial (the Court tries to set the pretrial conference around three weeks in advance of trial, so backing up further to the motions in limine and briefing on motions might very well be more than 45 days in advance of trial).

In contrast, however, there is no requirement of pretrial notice for Federal Rule of Evidence 608(b), neither in its text nor any case law interpreting it. (In their reply, the defense misunderstands that the government has agreed to 45-day notice of Rule 608(b) evidence; the government only agreed that impeachment evidence that is also covered by Rule 404(b) will be disclosed on that timeline.) Of course due process concerns can override this lack of rule-based pretrial notice, but there is nothing to suggest there is a constitutional problem with applying the normal rule here. Having

24

said that, both the government and the defense shall ask for a sidebar before starting a line of questioning on Rule 608(b) evidence (remember, that category of evidence is limited to specific instances of conduct that attacks character for truthfulness).

**Santiago Proffer Deadline (R. 109).** The government has agreed to disclose the *Santiago* proffer 45 days before trial; the defense wants a 60-day heads up. The Court adopts the 60-day timeline. Given the scope of the case and the apparent importance of co-conspirator statements on the intercepted calls, the *Santiago* proffer is likely to be extensive in this case. Indeed, the proffer must be accompanied by draft transcripts of the proposed calls so that the parties can ensure, before trial and to avoid wasting the jury's time, that the pretrial conference will be productive in identifying and resolving any Rule 801(d)(2)(E) disputes. It makes sense to start the briefing on the *Santiago* proffer ahead of the motions in limine (although it might not be that much ahead, as explained in the previous discussion). So the government shall disclose the *Santiago* proffer 60 days before trial.

**Residual Hearsay Notice (R. 111).** Barton asks for immediate notice of any evidence that the government seeks to introduce under Federal Rule of Evidence 807 (the residual hearsay rule). The notice will coincide with the motions in limine deadline, which will be set later.

***Brady/Giglio* (R. 112).** Next, Barton and Owen generically list a plethora of information that they believe ought to be disclosed as exculpatory or impeaching. R. 112 at 2–5. This overbroad motion is not well taken; the Court of course would resolve concrete *Brady* and *Giglio* disputes, but this motion does not present any. Instead,

25

some of the categories (or subcategories) of information are plainly not covered by *Brady* or *Giglio*, such as categories not limited by the element of materiality; impeachment-only information for potential witnesses rather than actual trial witnesses; and polygraph evidence, *see United States v. Scheffer*, 523 U.S. 303, 312–13 (1998); *Snow v. Pfister*, 880 F.3d 857, 869 (7th Cir. 2018). In the face of a generalized motion like this, the government's recognition of its obligations under *Brady* and *Giglio* is a sufficient response, nor is immediate disclosure required. Having said that, the Court will set an earlier 18 U.S.C. § 3500 and *Giglio* than the three-weeks-before-trial identified by the government. That information must be disclosed 10 days before the motions in limine deadline, so that the defense can incorporate them into a motion in limine (subject to protective orders) if needed. If there is a genuine safety issue, then the government must seek relief from this deadline.

**Informants/Cooperators (R. 110).** Finally, the parties dispute when discoverable information on cooperators should be disclosed. To coincide with the § 3500 and *Giglio* deadline, this discovery shall be disclosed 10 days before the motions in limine are due.

## VI. Conclusion

Barton's motions to dismiss the indictment, R. 100, to sever his trial, R. 102, to change venue, R. 103, and to suppress wiretap evidence, R. 108, are denied. The motions for a bill of particulars are also denied. Rule 404(b) evidence shall be disclosed 45 days before trial; there is no advance warning required for Rule 608(b) evidence. The *Santiago* proffer must be filed 60 days in advance of trial. Any invocation

26

of Evidence Rule 807 shall be done via motion, coinciding with the motions in limine deadline. The *Brady/Giglio* motion is denied without prejudice, given the generalized nature of the motion and the government's acknowledgment of its duties. But 18 U.S.C. § 3500 and *Giglio*, along with discoverable information on cooperators, will be due 10 days before the motions in limine deadline.

With this decision in place, defense counsel shall confer with the Defendants, as well as the government, about the direction of the case. The tracking status hearing of August 27, 2021, is reset to September 24, 2021 at 8:30 a.m., but to track the case only (no appearance is required). Instead, the parties shall file a detailed status report on September 17, 2021.

ENTERED:

s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: August 26, 2021

27